**FIRESTONE TIRE AND RUBBER COMPANY,**
Plaintiff-Appellant/Cross-Appellee,

v.

Raynal PEARSON, Marden D. Pearson, and Dwaine Pearson, a general partnership d/b/a Pearson Tire Company; Raynal Pearson, Marden D. Pearson, and Dwaine Pearson, a general partnership d/b/a Pearson Tire Center; Sevier Valley Oil Company, Inc.; and Pearson Tire and Distributing Company, Defendants-Appellees/Cross-Appellants.

Nos. 82–2449, 82–2494.

United States Court of Appeals, Tenth Circuit.

Aug. 5, 1985.

Bradley D. Holm, Salt Lake City, Utah
(Robert B. Lochhead's of Rooker, Larsen,
Kimball, Parr & Crockett, Salt Lake City

Utah, and Ray G. Martineau, Salt Lake City, Utah, on briefs), for plaintiff-appellant/cross-appellee.

Robert A. Peterson of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah (Ken Chamberlain of Olsen & Chamberlain, Salt Lake City, Utah, with him on briefs), for defendants-appellees/cross-appellants.

Before HOLLOWAY and LOGAN, Circuit Judges, and BURCIAGA, District Judge.[*]

BURCIAGA, District Judge.

This is an appeal from a jury verdict in a contract action and a cross-appeal from the trial court's determination of the applicable statute of limitations and denial of prejudgment interest. Plaintiff-Appellant Firestone Tire and Rubber Company [Firestone] appeals entry of final judgment after a jury verdict awarding damages against Firestone on Defendants-Cross Appellants' counterclaim. Defendants-Cross Appellants Raynal Pearson, Marden Pearson, Dwaine Pearson, Pearson Tire Company, Pearson Tire Center, Sevier Valley Oil Company, Inc., and Pearson Tire and Distributing Company [referred to collectively as the Pearsons] appeal from the trial court's application of the Utah six-year statute of limitations to their damages claims and from the trial court's order denying prejudgment interest on their claims. We affirm in most respects, but reverse as to the applicable statute of limitations, and reverse and remand for a new trial as to the amount of damages.

This case arose from a business relationship between Firestone[1] and the Pearsons that began in 1959. At that time, Raynal Pearson, Marden Pearson and Dwaine Pearson owned a controlling interest in Pearson & Crofts, a Utah corporation. Pearson & Crofts owned a warehouse in Salt Lake City, Utah. In May of 1959, Pearson & Crofts entered into an agree-

ment with Seiberling Rubber Company [Seiberling], establishing a warehousing operation in Salt Lake City, Utah, for Seiberling products. Under the agreement it acted as a warehouser for a sales territory covering Utah, southern Idaho and small parts of Wyoming and Nevada. Pearson & Crofts received a commission of 5% on shipments out of their warehouse. It also acted as a Seiberling retail distributor. This agreement preceded the two warehouse agreements at issue in this case. Another Utah corporation owned by the Pearson family, Sevier Valley Oil Company, Inc. [Sevier valley], acted as a Seiberling retail distributor in Richfield, Utah, approximately 150 miles southeast of Salt Lake City.

Firestone acquired Seiberling in early 1965, at which time Seiberling became an operating division of Firestone. In the summer and fall of 1965, the Pearsons and Firestone entered into discussions concerning the possibility of expanding the Pearsons' existing tire warehousing and retail operations. This expansion required the Pearsons to acquire a new warehouse.

During the course of the discussions, but prior to the execution of a formal warehouse agreement between the Pearsons and Firestone, Seiberling's General Sales Manager, Mr. C.W. Dunn, wrote Raynal Pearson a letter [the Dunn letter] confirming some items the parties had negotiated relating to the new warehouse. The Dunn letter, dated October 21, 1965, stated in part that

(2) As a servicing dealer warehouse for The Seiberling Tire and Rubber Company, all Seiberling brand tires shipped into ... [the Utah sales] territory ... will be shipped through the [Pearsons'] dealer warehouse in Salt Lake City whenever possible. I am sure you can appreciate the fact that from time to time any given shipping point is out of merchandise and that emergencies arise necessitating

---

[*] Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation.

1. "Firestone," as used in this opinion, makes reference both to Firestone Tire and Rubber Company and to the Seiberling Tire and Rubber Company, an operating division of Firestone Tire and Rubber Company.

shipments from alternate warehouses. We will, however, ship all merchandise possible from the dealer warehouse in Salt Lake City operating under the name "Pearson's Auto-Car Center."

Defendants' Exhibit B.

On December 6, 1965, Firestone and Pearson Tire & Distributing Company entered into a new warehouse agreement. The provisions of the agreement relevant to this dispute are as follows:

1. COMPANY [Firestone] shall ship, consigned to itself in care of FACTOR [Pearson Tire & Distributing Company] such quantities of tires ... as will, in its judgment, constitute an adequate auxiliary stock to the stock of merchandise maintained in COMPANY's regular District Warehouses. Said auxiliary stock shall be used (i) as required from time to time to supply COMPANY's distributors located ... in FACTOR's trade area ..., and (ii) to supply FACTOR for his own account.

. . . . .

3. ...

FACTOR is privileged to withdraw merchandise from time to time for his own account, subject to credit limitations imposed by COMPANY.

4. ... FACTOR shall (i) report to COMPANY no later than the tenth and twentieth and the end of each month all withdrawals for FACTOR's own account....

5. FACTOR shall promptly pay to COMPANY, in accordance with COMPANY's then-current prices and terms, all amounts due for merchandise purchased for his own account.

. . . . .

7. FACTOR shall receive, via monthly credit memoranda, as full compensation for his services and expenses (other than cartage and transportation expenses) in warehousing and shipping merchandise hereunder 5% of FACTOR's ... price with respect to all merchandise shipped by FACTOR at COMPANY's request, in accordance with this Agreement, except merchandise withdrawn by FACTOR for his own account....

. . . . .

13. This Agreement ... supersedes and cancels all rights and obligations arising under prior agreements referring to the subject matter hereof.... The provisions of this Agreement cannot be waived, altered, or modified except by a writing duly signed by both FACTOR and COMPANY....

. . . . .

15. This Agreement shall be governed by and construed under the laws of the State of Ohio.

Defendants' Exhibits BB, CC. Firestone and Pearson Tire and Distributing Company executed a second warehouse agreement, containing the same provisions, on July 26, 1967. The second warehouse agreement related both to the warehouse already operating in Salt Lake City and to an additional warehouse the Pearsons established in Provo, Utah.

At the time the warehouse agreements were executed, Pearson Tire and Distributing Company was a partnership. Subsequently, a corporation by the same name was organized, which the Pearson brothers owned. Pearson Tire and Distributing Company also owned and operated the Salt Lake City retail store. In addition to the warehousing and retail operations in Salt Lake City and the warehouse in Provo, the Pearson family owned retail tire businesses in Richfield, Provo and Murray, a suburb of Salt Lake City. The four retail outlets all carried the Seiberling line of tires. Firestone billed the retail stores separately. The retail business in Salt Lake City operated in the same building as the warehousing business.

The Pearsons and Firestone conducted business with each other under the two warehouse agreements for almost fifteen years. In accordance with its interpretation of the phrase "for his own account" in the warehouse agreements, Firestone did not pay warehouse commissions on merchandise the Pearsons withdrew from the

warehouse for sale by the Pearsons' Salt Lake City and Murray retail outlets. Firestone did pay warehouse commissions on merchandise the Pearsons withdrew for sale by their Provo and Richfield retail outlets. Firestone paid all warehouse commissions via regular monthly credit memoranda.

During the course of the business relationship between Firestone and the Pearsons, Firestone did not ship all Seiberling tires sold in the Utah sales territory through the Pearsons' Salt Lake City warehouse. Instead, Firestone shipped certain orders directly from the factory into the territory. The orders Firestone shipped directly into the territory included discounted large volume orders, discontinued or blemished tires, and other specially discounted orders. Firestone did not feel that it was economically feasible to ship these orders through the Salt Lake City warehouse.

During the parties' business relationship, Firestone paid the Pearsons warehouse commissions on approximately half of the Seiberling merchandise sold in the Utah sales territory. The rest of the Seiberling tires sold in the territory either were shipped directly to various retail outlets or were sold through the warehouse to the Pearsons' Salt Lake City or Murray retail outlets.

Raynal Pearson became aware that not all of the Seiberling tires going into the Utah sales territory were being shipped through the Pearsons' Salt Lake City warehouse. Mr. Pearson considered this to be a violation of the agreement expressed in the Dunn letter. Mr. Pearson wrote Firestone to protest the bypassed shipments several times. *See, e.g.,* Defendants' Exhibits B, F, G, I, J, K, L, M, R.

On April 24, 1967, Mr. Pearson wrote to Mr. W.E. Slutz, a vice president of Firestone's Seiberling operating division, protesting the direct factory shipments into

the territory. Mr. Slutz responded to Mr. Pearson's complaint in a letter dated June 12, 1967 [the Slutz letter]. That letter stated, in part, that "[s]o far as warehousing is concerned, the letter agreement, signed by C.W. Dunn, dated October 21, 1965, concerning paragraphs (2) and (3), has been in effect since that time, to the best of my knowledge, and we have no plans to change it." Defendants' Exhibit H. Firestone, however, did not change their procedures regarding direct factory shipments in response to Mr. Pearson's protests.

Mr. Pearson continued to complain to Firestone from time to time regarding the direct factory shipments. Despite Mr. Pearson's complaints, however, the Pearson business entities themselves placed numerous large volume and discounted orders that were shipped directly from Firestone to the Pearsons' retail outlets. Firestone did not pay warehouse commissions on the direct factory shipments from Firestone to the Pearsons' retail businesses.

Firestone discontinued the Seiberling line of tires in 1979. Shortly thereafter Firestone brought four separate actions against the various defendants in the United States District Court for the District of Utah to collect amounts owed Firestone for merchandise purchased by the Pearson business entities. The Pearsons counterclaimed, alleging that Firestone had breached the agreement, expressed in the Dunn and Slutz letters, to ship merchandise into the Utah sales territory through the Pearsons' Salt Lake City warehouse whenever possible.[2] The counterclaim alleged the Pearsons were entitled to damages for warehouse commissions they would have been paid, had the merchandise Firestone shipped directly into the territory been shipped instead through the Salt Lake City warehouse. Upon the Pearsons' motion and by stipulation of the parties, the four cases were consolidated.

---

2. The counterclaim also alleged damages for Firestone's failure to pay certain freight allowances for shipments made by the Pearsons from the warehouse to the Pearson retail outlets. The jury found for the Pearsons on the claim for the freight allowances. The award of freight allowances is not a subject of this appeal except insofar as the Pearsons appeal the trial court's denial of prejudgment interest on all of the Pearson's claims.

Shortly before the trial began, counsel for Firestone discovered that for a long period of time the Pearsons had engaged in the practice of submitting warehouse shipping orders to Firestone for sales and shipments of tires that never actually took place. The Pearsons had been submitting to Firestone documents showing sales and shipments from the Salt Lake City warehouse to the Pearsons' retail tire business in Richfield. These shipments never were made, however, and the merchandise described in the documents remained in the Pearsons' Salt Lake City warehouse until it was sold by the Pearsons' Salt Lake City retail outlet.

As discussed previously, Firestone did not pay warehouse commissions on merchandise withdrawn from the warehouse for sale in the Salt Lake City retail outlet. Firestone, however, did pay warehouse commissions on merchandise withdrawn from the warehouse for sale in the Richfield retail outlet. As a result of the submission of false documents, Firestone paid the Pearsons freight handling allowances for merchandise that never was shipped from the warehouse, and warehouse commissions on merchandise for which Firestone ordinarily would not pay commissions.

When Firestone discovered the fictitious shipments, the Pearsons amended their claims for unpaid freight handling allowances to offset the unearned freight handling allowances Firestone had paid on the fictitious shipments. The Pearsons, however, asserted that the fictitious shipments had no effect on their claims for warehouse commissions. According to the Pearsons' interpretation of the warehouse agreement, they were entitled to warehouse commissions on merchandise withdrawn from the warehouse for sale in the Salt Lake City retail outlet. Firestone sought to amend its complaint to add a claim for the warehouse commissions and freight handling allowances it had paid on the fictitious shipments. Counsel for the Pearsons objected to amending the complaint such a short time before trial. The trial court held that the trial should proceed on the issues as previously framed and reserved Firestone's additional claim for future determination.

The parties stipulated to the amount the Pearsons owed to Firestone and the counterclaim was tried to a jury. Over Firestone's objections, the case was submitted to the jury on a general verdict and a limited set of special interrogatories. The special interrogatories asked the jury to divide the amount of any judgment according to the separate claims for freight allowances and warehouse commissions, and to make a chronological allocation of damages so that the trial court could apply the statute of limitations it determined to be appropriate.

The jury returned a verdict for the Pearsons on the counterclaim for warehouse commissions in the amount of $342,095. This verdict was substantially less than the amount of warehouse commissions the Pearsons claimed they were entitled to recover. The trial court ruled that the Utah six-year statute of limitations was applicable and reduced the award of damages for warehouse commissions by $74,622, in accordance with the jury's chronological allocation of damages. The trial court also determined that prejudgment interest should not be allowed on the Pearsons' claims.

Firestone moved the district court for a judgment notwithstanding the verdict or, alternatively, for a new trial or a reduction in the amount of the verdict. The trial court denied the motions and Firestone appeals. The Pearsons cross-appeal the trial court's ruling on the applicable statute of limitations and the trial court's denial of prejudgment interest.

After carefully considering the cumbersome record on appeal, this Court has concluded that it must reverse and remand for a partial retrial on the issue of damages. Because of the factual complexity of the case, this Court will discuss all of the issues raised in the appeal and cross appeal so that the trial court will have clear guidance on the scope of the issues to be retried.

FIRESTONE'S APPEAL

In its appeal, Firestone argues that the trial court erred in not granting Firestone's motion for a judgment notwithstanding the verdict or, alternatively, for a new trial. Firestone contends that the trial court should have granted its motion for a judgment notwithstanding the verdict because 1) the warehouse agreements, by their express provisions, superseded and cancelled any agreement based on the Dunn and Slutz letters, 2) the Pearsons waived their claims for additional warehouse commissions as a matter of law, and 3) the Pearsons failed to meet their burden of proving the amount of damages with reasonable certainty. Firestone contends that the trial court should have granted its motion for a new trial because 1) the trial court erred in refusing to give Firestone's requested jury instruction number 56, 2) Firestone was prejudiced by the jury's consideration of Exhibit "EE", and 3) the trial court committed prejudicial error by refusing to submit the case on the extensive special interrogatories requested by Firestone.

## I. *Integration Clause.*

■ The threshold inquiry concerning liability in this case was whether the Dunn and Slutz letters created an obligation for Firestone to ship tires into the Utah sales territory "whenever possible." With regard to this threshold issue, Firestone argues that it was entitled to a judgment in its favor as a matter of law because the warehouse agreements, by their express provisions, superseded and cancelled any rights and obligations of the parties arising under any prior agreements. Because the Pearsons' claims for additional warehouse commissions arose out of correspondence outside the written warehouse agreements, Firestone argues that the claims are barred by the express terms of the contract.

In its motion for a directed verdict at the close of the evidence Firestone argued that the warehouse agreements precluded the Pearsons' claims for additional warehouse commissions as a matter of law. Tr. Vol. XI at 145–50. The Pearsons argued that

the subject matter of the Dunn and Slutz letters formed a separate agreement that was not superseded or cancelled by the warehouse agreements. *Id.* at 165–68. Pearsons further argued that the Dunn and Slutz letters, together with the warehouse agreements, formed the entire agreement between the parties, and that all the written instruments had to be read together. *Id.* at 167.

The issue of whether the Dunn and Slutz letters formed an agreement separate from the warehouse agreement raised a question of fact that properly could have been decided by the jury. *See Gomez v. American Electric Power Service Corp.,* 726 F.2d 649 (10th Cir.1984) (where intent of the parties is disputed, interpretation of contract raises factual question); *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758 (10th Cir.1983) (question of whether parties intended a document to constitute final agreement is one of fact).

■ Firestone, however, neither submitted instructions on the integration issue, nor otherwise requested that the question of intent of the parties be submitted to the jury. Instead Firestone, without objection, permitted the jury to be instructed as follows:

Now, you are instructed that Firestone and the Pearsons entered into a contract pursuant to which Firestone agreed to ship all tires into Pearsons' warehouse territory through that warehouse whenever possible. The Pearsons claim that the language, "whenever possible," was meant to apply only to emergencies or similar circumstances. Firestone claims that the language, "whenever possible," meant any situation in which, in Firestone's judgment, it was not economically practicable to ship tires through the Pearson warehouse....

Tr. Vol. XII at 157–58. This instruction, in effect, admitted the existence of the agreement expressed in the Dunn and Slutz letters. Where no objections are made to instructions at trial, the substance of the instructions become part of the law of the case. *See Murphy v. Dyer,* 409 F.2d 747

(10th Cir.1969); *Green v. American Tobacco Co.*, 325 F.2d 673 (5th Cir.1963). Because Firestone did not object to the above-quoted instruction, it is precluded on appeal from disputing the existence of the agreement, contained in the Dunn and Slutz letters, to ship merchandise into the Utah sales territory through the Pearsons' warehouse whenever possible.

The jury was left to determine the meaning of the phrase "whenever possible" in the Dunn letter. At trial, Firestone argued that the phrase "whenever possible" meant whenever it was economically feasible. The Pearsons contended that "whenever possible" meant, essentially, whenever it was physically possible. By returning a verdict for the Pearsons on their counterclaim, the jury clearly resolved this issue in favor of the Pearsons.

Because Firestone did not object to the quoted jury instruction at trial, the trial court did not err by refusing to grant Firestone a judgment notwithstanding the verdict on the grounds that the warehouse agreements superseded and cancelled all other agreements. On retrial, Firestone may not dispute the existence of the agreement expressed in the Dunn and Slutz letters, nor may it argue that "whenever possible" meant whenever economically feasible. Firestone is bound by the jury's determination that it is liable to the Pearsons for unpaid warehouse commissions.

II. *Waiver.*

■ Firestone argues that the Pearsons waived their claims for additional warehouse commissions as a matter of law. Firestone bases its argument on two theories. First, Firestone argues that because the Pearsons' retail outlets took advantage of the benefit of the discounted direct shipments, they forfeited their right to claim damages for warehouse commissions on the direct shipments. Second, Firestone argues that the Pearsons' claims for additional warehouse commissions are barred because, by the terms of the warehouse agreements, the Pearsons accepted the monthly credit memoranda that Firestone issued as "payment in full."

The assertion that the Pearsons waived their claims as a matter of law is not without merit. Firestone, however, is precluded from raising this issue on appeal. Firestone did not raise the question of waiver as a matter of law in its motion for a directed verdict. Tr. Vol XI at 145–63. At trial, Firestone requested jury instructions on the questions of estoppel and waiver. These instructions were given to the jury. Tr. Vol. XII at 161–63. Firestone did not raise the issue of waiver as a matter of law until they filed their motion for a judgment notwithstanding the verdict, after the jury had rendered a verdict in favor of the Pearsons. Tr. Vol. III at 488.

■ An appellate court may not consider the contention that the trial court erred in denying an appellant's motion for a judgment notwithstanding the verdict where the appellant failed to move for a directed verdict at the close of the evidence, as required by Rule 50 of the Federal Rules of Civil Procedure. *Freimanis v. Sea-Land Service, Inc.*, 654 F.2d 1155, 1161 (5th Cir. 1981); *see Continental Baking Co. v. Utah Pie Co.*, 349 F.2d 122 (10th Cir.1965), *rev'd on other grounds*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (appellate court may not review an issue not properly preserved by a motion for a directed verdict or other like motion). Firestone did not properly preserve the issue of waiver by motion for a directed verdict. Instead, by its requested instructions, Firestone submitted the issue to the jury. The jury found against Firestone on their claim of waiver. Firestone cannot now ask that this Court reconsider the issue as a matter of law. The trial court did not err in refusing to grant Firestone's motion for a judgment notwithstanding the verdict on the grounds that the Pearsons waived their claims as a matter of law.

Because the issues of waiver and estoppel were presented to, and decided by the

jury, Firestone may not relitigate them on retrial. The issues on retrial will be limited to the proper measure of damages as discussed below.

### III. *The Pearson's Evidence of Damages.*

The damage analysis of the Pearsons' expert accountant did not take into consideration the costs the Pearsons saved because of the reduced volume of merchandise shipped through the Pearsons' warehouse. Tr. Vol. IX at 187–91. On cross-examination, the Pearsons' expert testified as follows:

Q. Now does ... [the damages figure] assume that Pearson would have paid the cost of handling of all of that merchandise that went into the territory?

A. No.

Q. Does it assume—it only assumes the warehouse handling costs on the warehouse at 2195 South Main Street, doesn't it?

A. It doesn't necessarily assume any warehouse handling costs. It is just predicated on the sales and the interpretation of the agreement to pay five percent commission on those sales.

Q. Well, wouldn't Pearson have incurred additional handling costs if all of these sales that you have predicated this on had gone through the warehouse?

A. Well, they undoubtedly would have, but I am not certain that that is an element of the agreement between the parties and, therefore, is irrelevant.

. . . . .

Q. Your opinion completely ignores that whole aspect of the operation down there, doesn't it?

A. It does. And we are not here to try to push cost back-and-forth. I think we are here to address the amount of revenue or commissions that have been foregone.

*Id.* at 187, 188, 190, 191. On appeal, Firestone contends that the Pearsons failed to meet their burden of proving the amount of damages with reasonable certainty, because the damages evidence presented by the Pearsons failed to quantify the costs the Pearsons saved as a result of the bypass of their warehouse.

■ As a threshold issue, this Court must determine which state's law applies to the damages issue. The proper measure and elements of contract damages "are matters pertaining to the substance of the right and not to the remedy and are to be determined by the place of the contract." *Anderson-Thompson, Inc. v. Logan Grain Co.*, 238 F.2d 598, 602 (10th Cir.1956). The warehouse agreements provided that they were to be "governed by and construed under the laws of the State of Ohio." The State of Ohio thus is the "place of the contract" and its law governs the proper measure of damages.

The Supreme Court of Ohio has addressed squarely the issue of costs avoided in an action for breach of contract. In *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 86 N.E.2d 782 (Ohio 1949), the Ohio Supreme Court stated:

When a plaintiff sues on a contract to recover the amount he would have received for the full performance prevented by a defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract which profit defendant's breach prevented him from earning. In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received from the performance so prevented, but also (2) what such performance would have cost him (or the value to him of relief therefrom).

*Id.,* 86 N.E.2d at 784; *see also Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.,* 6 Ohio St.3d 436, 439–

42, 453 N.E.2d 683, 687–88 (Ohio 1983) (Brown, J., concurring).

■ In the case at bar the Pearsons, in essence, are claiming damages for the profit they would have received for their performance as warehousers under the terms of the Dunn letter, had Firestone not prevented their performance by its breach. Under the holding of *Castle Farm Amusement Co., supra*, the Pearsons are not entitled to recover the full amount of unpaid warehouse commission called for by the warehouse agreements. The Pearsons may recover only the amount of warehouse commission they would have received had the contract been performed, less the costs they saved because of Firestone's breach. Because the Pearsons failed to quantify their cost savings, they did not meet their burden of proving the proper measure and elements of damages under the holding of *Castle Farm Amusement Co., supra.*

■ Firestone contends that the Pearsons' failure to quantify their cost savings entitles Firestone to a judgment notwithstanding the verdict. In an appeal from the denial of a motion for a judgment notwithstanding the verdict an appellate court may, in appropriate circumstances, instead order a new trial. *Neely v. Eby Construction Co.*, 386 U.S. 317, 329, 87 S.Ct. 1072, 1080, 18 L.Ed.2d 75 (1967); *Marino v. Ballestas*, 749 F.2d 162, 169 (3d Cir.1984); *Jones v. Dodson*, 727 F.2d 1329, 1339 (4th Cir.1984). A judgment notwithstanding the verdict in this case would, in effect, negate the jury's finding of liability under the contract. Such a result is not mandated. The trial in this case was lengthy and the evidence as to liability and damages was complex. Because the parties' dealings under the contract covered a period of sixteen years, the proof of damages was inherently difficult. The jury apparently became confused in determining the proper amount of damages, because of the complexity of the accounting data. The confusion concerning the proper measure of damages, however, did not affect the determination of liability.

■ In view of the complexity of the damages evidence and the difficulty of proof, we believe that the interests of justice require a new trial as to the proper amount of damages, rather than a judgment notwithstanding the verdict. *See Center Chemical Co. v. Avril, Inc.*, 392 F.2d 289 (5th Cir.1968) (new trial mandated where proof of loss of future profits as a result of breach of contract was insufficient). When the issues of liability and damages are distinct, a new trial may be limited to the issue of damages. *Brown v. Richard W. Wacholz, Inc.*, 467 F.2d 18 (10th Cir.1972).

**IV. *Firestone's Requested Jury Instruction No. 56.***

■ At trial, the parties disagreed as to the meaning of the phrase "for his own account," contained in paragraph 7 of the warehouse agreements. According to the Pearsons, the disputed phrase referred only to tires or other merchandise they withdrew from the warehouse for use on their own company vehicles. They thus claimed to be entitled to warehouse commissions on all Seiberling merchandise sold into the territory except for merchandise withdrawn from the warehouse for company use. Firestone interpreted the disputed phrase to refer to merchandise withdrawn from the warehouse for sale by the Pearsons' Salt Lake City retail outlet. Under this interpretation, the Pearsons would not have been entitled to warehouse commissions for merchandise sold by the Salt Lake City retail store.

The interpretation of the phrase "for his own account" had an important impact on the measure of damages. If Firestone's interpretation of the phrase were correct, the Pearsons would not have been entitled to damages for warehouse commissions for tires sold to the Salt Lake City retail outlet. Additionally, Firestone would have been entitled to recover the warehouse commissions they had paid for the "fictious shipments" that the Pearsons had represented

were shipped from the warehouse to the Richfield retail outlet, but that actually were kept in the warehouse and sold by the Salt Lake City retail outlet.

At trial the Pearsons, in accordance with their interpretation of the warehouse agreements, claimed to be entitled to warehouse commissions on almost all Seiberling tires that Firestone had shipped into the Utah sales territory. To establish their claimed damages, the Pearsons introduced at trial Exhibit "X," a notebook containing copies of computer print-outs that included records of Firestone's sales into the Utah sales territory for most of the relevant period. Tr. Vol. IX at 139. The Pearsons then introduced Exhibits "EE" and "JJ," summaries and analyses of the data in Exhibit "X," prepared by the Pearsons' expert accounting witness. *Id.* at 137–61. Exhibits "EE" and "JJ" computed the amount the Pearsons claimed was the total of the warehouse commissions that would have been payable had *all* the Seiberling tires sold into the Utah sales territory gone through the Pearson warehouse. *Id.* The Pearsons' expert derived the total amount of the Pearsons' damages by taking the total warehouse commissions the Pearsons claimed would have been payable, and subtracting from that figure the amount of commissions Firestone actually paid to the Pearsons. *Id.*

The Pearsons did not introduce any evidence of the amount of their damages under Firestone's interpretation of the phrase "for his own account." There was no direct evidence of the amount of the claimed damages attributable to the sales of the Salt Lake City retail outlet. If the jury agreed with Firestone's interpretation of the disputed phrase, it had no basis to determine the proper amount of damages.

Because there was no evidence from which the jury could calculate the proper amount of damages under Firestone's interpretation of the warehouse agreement, Firestone's requested Jury Instruction No. 56 stated, in part, as follows:

If you find that the phrase "for his own account" refers to merchandise withdrawn from the warehouse for sale by the Pearson Salt Lake or Murray retail outlets, then the Pearsons are not entitled to claim warehouse handling allowances on merchandise that was sold out of those stores. In that event, the value of warehouse handling allowance for merchandise sold out of the Salt Lake and Murray outlets would have to be deducted from the amount claimed by the defendants as damages. I instruct you, however, that the evidence presented gives you no rational basis by which you would be able to compute the proper deduction. Therefore, if you find that defendants were not entitled to warehouse handling allowance on merchandise sold out of their Salt Lake or Murray stores, then defendants will have failed on an essential element of their proof, and you must in that event find against defendants and for plaintiff on the question of defendants' claims for additional warehouse handling allowances.

Tr. Vol. II at 387, 388. This instruction, in effect, required the jury to find against the Pearsons on their entire claim for warehouse commissions if the jury found that the Pearsons were entitled only to part of the claimed damages.

The district court gave most of Firestone's requested Instruction 56. The court, however, over Firestone's objection, refused to give that part of the instruction that required the jury to return a verdict for Firestone if it found that the Pearsons were not entitled to warehouse commissions for sales by the Salt Lake City or Murray retail outlets. Tr. Vol. XI at 272, 273.

Firestone argues that it is entitled to a new trial because the district court committed prejudicial error in refusing to give Firestone's requested Instruction 56 in its entirety. Firestone contends that because the Pearsons bore the burden of proving

the amount of their damages with reasonable certainty, they were required to prove the amount of damages under Firestone's interpretation of the warehouse agreements, as well as under their own interpretation of the agreements.

It is true, of course, that in an action for breach of contract, the party claiming the breach must prove the amount of his damages with reasonable certainty. It is equally true, however, that a party asserting a defense to a contract bears the burden of proving that defense. In this case, Firestone's interpretation of the contract had the effect of reducing the amount of the Pearsons' claimed damages, and therefore was in the nature of a defense to a part of the damages claimed by the Pearsons. Firestone bore the burden of proving the reduction in the amount of the Pearsons' claimed damages under Firestone's interpretation of the contract. The Pearsons were not required to prove Firestone's theory of the case as well as their own. The trial court properly refused to give the portion of the jury instruction requiring the jury to return a verdict for Firestone.

There is evidence in the record from which it can be inferred that the jury found Firestone's interpretation of the contract to be correct. During their deliberations the jury submitted to the court two questions:

> Are sales of Salt Lake retail outlet included in Exhibit JJ, Exhibit EE? Two: If so, how do we determine the percent or dollar amount of Salt Lake retail sales with respect to total territorial sales indicated by Exhibit JJ and Exhibit EE?

Tr. Vol. XII at 179. The court relayed the questions to counsel for Firestone and the Pearsons. Counsel could not agree to an appropriate response, however, and the court's response referred the jury to the testimony and the exhibits in evidence. The jury returned a verdict for the Pearsons in the amount of $342,095. The Pearsons had claimed damages in the amount of $435,145. Tr. Vol. IX at 166, Defendants' Exhibit EE.

The questions submitted by the jury during their deliberations and the fact that the jury returned damages substantially less than the amount claimed indicate that the jury agreed with Firestone's interpretation of the contract and attempted to deduct the warehouse commissions attributable to Salt Lake retail sales from the total claimed damages. Because this Court is remanding for a new trial on the amount of damages, and because there is evidence to suggest the jury found for Firestone with regard to this issue, on retrial, Firestone may introduce evidence to support its interpretation of the contract and the proper amount of damages under that interpretation.

## V. *Defendants' Exhibit EE.*

At trial, the Pearsons called Mr. Merrill Norman, an accountant, as an expert witness. Mr. Norman testified to his opinion of the amount of the Pearsons' damages for unpaid warehouse commissions. In conjunction with the expert testimony, the Pearsons introduced Defendants' Exhibit EE, a summary and analysis of accounting data contained in Defendants' Exhibit X. Defendants' Exhibit EE contained the figures that formed the basis of Mr. Norman's opinion as to damages as well as his computation of the damages themselves. Firestone contends that it was prejudiced by the jury's consideration of Exhibit EE because it was premised on certain assumptions that Firestone claims were erroneous.

"Trial courts have broad discretion in determining the extent to which expert testimony is admissible." *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 861, 863 (10th Cir.1979). A trial court's determination as to the competency and admissibility of expert testimony "is reviewable only for abuse of discretion." *United Telecommunications, Inc. v. American Television & Communications Corp.,* 536 F.2d 1310, 1317 (10th Cir.1976). In the case at bar,

while Mr. Norman's opinion may have been based upon "speculation derived from incomplete data," admission of his testimony and opinions was not an abuse of discretion when "he fully disclosed any inadequacies in the information he was relying on and he was subjected to a thorough cross-examination." *Scholz Homes,* 590 F.2d at 863.

## VI. *Special Interrogatories.*

■ At trial, Firestone requested that detailed special interrogatories be submitted to the jury. The trial court denied Firestone's request and submitted the case to the jury on a limited set of special interrogatories and a general verdict. Firestone contends that the trial court committed prejudicial error in refusing to submit the case on the requested special interrogatories.

■ The submission of special interrogatories lies within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Miller's National Insurance Co. v. Wichita Flour Mills Co.,* 257 F.2d 93, 101 (10th Cir.1958). In the case at bar, the instructions given adequately guided the jury's deliberations. Although special interrogatories might have been helpful in determining how the jury reached its verdict, there was no abuse of discretion in the trial court's refusal to submit the requested special interrogatories.

## THE PEARSONS' CROSS–APPEAL

### I. *Statute of Limitations.*

■ At trial the Pearsons presented evidence as to the amount of unpaid warehouse commissions for a sixteen-year period, on a year by year basis. The trial court submitted the case to the jury on special interrogatories asking the jury the amount of damages awarded for the years 1966 through 1973 and years 1974 through 1980.

The jury returned an award of $74,622 for the period from 1966 through 1973, and $267,473 for the period from 1974 through 1980. Tr. Vol. II at 427. Subsequently, the trial court determined that the six-year Utah statute of limitations for breach of contract actions was applicable, and reduced the award of damages for warehouse commissions by $74,622. In their cross-appeal, the Pearsons contend that the trial court erred in applying the Utah six-year statute of limitations. The Pearsons argue that either the Utah statute of limitations for contracts on an open account, or the Ohio sixteen-year statute of limitations, is applicable.

In diversity cases, the "federal courts apply the rules of the states in which they sit when deciding questions of conflict of laws." *Haury v. Allstate Insurance Co.,* 384 F.2d 32, 34 (10th Cir.1967). Although the Utah courts have not ruled on the question, the vast majority of jurisdictions has held that the law of the forum determines whether an action is barred by the statute of limitations. *See, e.g., Haury, supra; Federal Deposit Insurance Corp. v. Peterson,* 565 F.Supp. 1007 (D.Colo. 1983); *Citibank, N.A. v. London,* 526 F.Supp. 793 (D.Tex.1981); *Sierra Life Insurance Co. v. First National Life Insurance Co.,* 85 N.M. 409, 512 P.2d 1245 (1973); *Catlett v. Catlett,* 412 P.2d 942 (Okla.1966). There is no reason to believe the courts of Utah would decide the issue differently from the majority.[3] This Court, therefore, will look to Utah law to determine the applicable limitation period.

Utah Code Ann. § 78–12–23 (1953) provides that an action brought upon a written contract must be brought within six years after the cause of action arises. The trial court applied this limitation period to the Pearsons' claims. On appeal, the Pearsons argue that their agreement with Firestone fell within the provisions of Utah Code Ann. § 78–12–25, which provides that "an

**3.** In this case, neither party contends that the choice of law regarding the statute of limitations is affected by Utah's Borrowing Statute, Utah Code Ann. § 78–12–45.

action upon a contract ... on an open account ... may be commenced at any time within four years after the last charge is made or the last payment is received." If the contract between the Pearsons and Firestone could be characterized as an "open account" within the meaning of the statute, none of the Pearsons counterclaims would be time-barred.

The Utah Supreme Court has defined an open account as:

an account usually and properly kept in writing wherein are set down by express or implied agreement of the parties concerned a connected series of debit and credit entries or reciprocal charges and allowances, and where the parties intend that the individual items of the account shall not be considered independently, but as a continuation of a related series, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits or credits are made thereto, until it shall suit the convenience of either party to settle and close the account.

*Bishop v. Parker*, 103 Utah 145, 134 P.2d 180, 182–83 (1943).

■ In a diversity case, a local district judge's view of the law of his state is persuasive and ordinarily is accepted by the court of appeals. *Sade v. Northern Natural Gas Co.*, 483 F.2d 230, 234 (10th Cir. 1973). In the case at bar, however, this Court is persuaded that the trial court erred in its application of the local law. The agreement between Firestone and the Pearsons falls squarely within the Utah Supreme Court's definition of an "open account." The Pearsons and Firestone engaged in a series of transactions in which the Pearsons were debited for the tires they purchased and credited for their warehouse commissions, freight allowances, and returned merchandise. The Pearsons' account was credited by use of credit entries in their monthly statements. The individual credits and debits were a continuation of a related series of transactions. The account remained open until Firestone discontinued the Seiberling line of tires and sought to recover from the Pearsons the balance due under the account. These are the characteristics of an "open account" as defined by the Utah Supreme Court. On retrial, the Utah statute of limitations governing open accounts will apply to the damages claimed.

II. *Prejudgment Interest.*

■ The trial court denied the Pearsons' motion to add prejudgment interest to the award of damages, both as to the claim for warehouse commissions and freight handling allowances.[4] The trial court, applying Ohio law, found that prejudgment interest was not permissible on the claims for warehouse commissions because the amount of damages was not readily ascertainable and could not be determined before the jury resolved the many conflicting issues of fact. Applying Utah law, the trial court found that the freight allowance claims were not subject to prejudgment interest because the damages were not fixed at a particular time and could not be calculated with mathematical accuracy. There was no error in these findings. The trial court's denial of prejudgment interest is affirmed.

Accordingly, the case is remanded for a new trial on the amount of damages to which the Pearsons are entitled on their counterclaim. On remand, each party may present evidence supporting its interpretation of the phrase "for his own account" contained in the contract and the proper amount of damages.

IT IS SO ORDERED.

---

4. The parties are in agreement that Utah law governs the award of interest on the claim for freight handling allowances, and Ohio law governs the award of interest on the claim for warehouse commissions.