941 F.2d 1213
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Judith M. KELLY, Plaintiff-Appellee and Cross-Appellant,
v.
KRUSE, LANDA, ZIMMERMAN & MAYCOCK, a partnership, James R.
Kruse, P.C., James R. Kruse and Delbert M. Draper,
Defendants-Appellants and Cross-Appellees.
 Nos. 89-4033, 89-4039.
 United States Court of Appeals, Tenth Circuit.
 Aug. 20, 1991.
 
 Before JOHN P. MOORE, TACHA and EBEL, Circuit Judges.
 ORDER AND JUDGMENT*
 EBEL, Circuit Judge.
 
 BACKGROUND
 
 1
 Appellee was an officer and director of Earth Energy Resources ("EER"), an oil exploration and investment company. EER hired appellants to advise it in several securities transactions. Nevertheless, EER sold several limited partnerships in violation of Nebraska Blue Sky Laws. The purchasers of these limited partnerships ("Nebraska investors") eventually sued appellant and several others under Nebraska's securities laws. The Nebraska investors prevailed, recovering a large judgment against appellee--far in excess of her ability to pay. Thereafter, appellee threatened to file bankruptcy.
 
 
 2
 The Nebraska investors, fearing that they would recover very little in the event that appellee did become bankrupt, or in the event that she successfully appealed the judgment, negotiated a contract with her. In exchange for the Nebraska investors' agreement to drop their claims against her, appellee agreed to: (1) drop her appeal of the Nebraska judgment; (2) not file for bankruptcy for 90 days after the execution of the agreement; (3) diligently prosecute a legal malpractice law suit against appellants for failing to inform her of her potential securities laws liability; (4) assign to the investors 99 percent of any damages she might recover in her suit against appellants, less her expenses so long as her expenses did not exceed 25 percent of the recovery; (5) immediately pay the investors $75,000; (6) provide the investors with copies of the pleadings, correspondence, and other relevant documents stemming from her legal malpractice lawsuit against appellants; (7) allow the Nebraska investors to intervene in and participate in the suit against appellants; (8) not settle the suit against appellants without first obtaining approval from the Nebraska investors.
 
 
 3
 Appellee prevailed in a bench trial, where she was awarded $2,316,090, in addition to a prejudgment interest rate of 7.87 percent. On direct appeal, in this court, appellants raise six issues. The first issue is whether the assignment of 99 percent of the proceeds represented an impermissible assignment of a legal malpractice claim. The second issue is whether appellants, retained by EER to advise it with respect to securities laws, owed a duty of care to the individual directors of that corporation. The third issue is whether the district court correctly ruled that appellants' failure to provide legal advice to the appellee was the proximate cause of her liability to the investors. The fourth issue is whether the district court properly allowed a particular expert to testify as to securities law matters. The fifth issue is whether the district court erred in holding an associate of the appellant-law firm to the standard of care of a specialist. The final issue is whether the district court awarded the appellee damages in excess of actual injury.
 
 
 4
 Appellee cross-appeals on two issues. The first cross-appeal asks whether the district court erred in denying one of appellee's claims for damages allegedly received as a result of a particular illegal security offering made by EER. The second cross-appeal issue is whether the court erred when it set the prejudgment interest rate on appellee's award at 7.87 percent.
 
 
 5
 We affirm the district court on each issue.
 
 ANALYSIS
 
 6
 A. Assignability Of Malpractice Claim Was Not Raised Below
 
 
 7
 The appellants' brief claims that "[t]he [a]ssignment of Mrs. Kelly's [c]ause of [a]ction [w]as [r]aised [b]efore the [t]rial [c]ourt.... [A]ppellants argued that the Kelly Agreement was an illegal attempt to assign a legal malpractice action. (Doc. 75 at 18-27)." Appellants' Br. at 12. We have carefully read Document 75 at pages 18 through 27, which is a "Memorandum in Support of Defendant's Motion to Limit Damages," and find no reference to the issue of the assignability of the legal malpractice cause of action under Utah law that would cause us to conclude that the issue was fairly raised in the district court.
 
 
 8
 After this concern was mentioned by this court during oral argument, appellants filed a supplemental authority that attempted to give "additional record citations establishing that the issue of the assignability of a legal malpractice cause of action was raised before the district court." Supp. Authority, January 24, 1991, at 1. That supplemental authority consisted of transcript excerpts of a motion for partial summary judgment. We have carefully examined this authority and conclude that it also did not raise the illegality of assigning the legal malpractice claim. To the contrary, it argued only that appellee had suffered a set amount of damages, and that this should limit her recovery. The oral arguments to which appellants cite, do briefly allude to the assignability of the action, but the reference was oblique and went only to the issue of the proper measure of damages suffered by appellee. In no way was the issue fairly raised below; therefore, we will not consider it.
 
 
 9
 B. Whether Appellant Had A Duty Or Obligation To Appellee
 
 
 10
 Appellants contend that they had no legal duty to warn or advise appellee of possible securities violations. The Utah Supreme Court has clearly stated that
 
 
 11
 [f]or a third party to have enforceable rights under a contract, then, that party must be an "intended beneficiary" of the contract, and the intention of the parties is to be determined from the terms of the contract as well as the surrounding facts and circumstances.
 
 
 12
 Ron Case Roofing & Asphalt v. Blomquist, 773 P.2d 1382, 1386 (Utah 1989). Thus, under Utah law, the intent of the parties is fairly dispositive on the issue of whether there was an intended third-party beneficiary in an attorney-client relationship. See Atkinson v. IHC Hospitals Inc., 798 P.2d 733, 735 (Utah 1990) (quoting Flaherty v. Weinberg, 492 A.2d 618, 625 (Md.1985) (" '[T]he test for third party recovery is whether the intent to benefit actually existed, not whether there could have been an intent to benefit the third party.' "), cert. denied 111 S.Ct. 970 (1991).
 
 
 13
 We have carefully examined the evidence and find nothing that would lead us to conclude that the district court was clearly erroneous in stating that the "retention agreement ... gave rise to a binding contractual obligation on the part of [appellants] to perform the enumerated services including an obligation to [appellee], as a third-party beneficiary of that agreement." Dist. Ct.'s Findings of Fact and Conclusions of Law at 13. We note that although courts have held that "the fact that an attorney represents a corporation does not make that attorney counsel to officers and directors of the corporation," Kline Hotel Partners v. Aircoa Equity Interests, 708 F.Supp. 1193, 1195 (D.Colo.1989); Stratton Group, Ltd. v. Sprayregen, 466 F.Supp. 1180, 1184 n. 3 (S.D.N.Y.1979), there is little doubt that a contract can specifically define legal duties. In this case, the retention agreement, entered into by the law firm, stated that appellants agreed to provide "[a]dvice with respect to liabilities ... [of] officers, directors and others in connection with ... the offering." Appellants' Br. at 6 (quoting p 9 of the Retention Agreement). Given this language, we cannot find error in the district court's conclusion that the agreement created an intended third-party beneficiary relationship with appellee and that appellants breached that obligation.
 
 
 14
 Appellants have also argued that Draper, who was an associate at the law firm, had no obligation or duty to appellee because he was not a signatory to the retention agreement. The district court, however, specifically found that the appellants "failed to meet the standard of care which prevailed among the general community of securities lawyers and were therefore negligent relating to each of the Earth Energy offerings.... [i]n failing to warn Earth Energy or its officers and directors...." Dist.Ct.'s Findings of Fact and Conclusions of Law, at 25, 26. The conclusion that Draper, even as a non-signatory to the retention agreement, could be liable to appellee is consistent with Utah law which states that " 'any duty owed by an attorney to a third party is derivative of the duty owed by that attorney to his client,' " Atkinson, 798 P.2d at 736 (quoting Franko v. Mitchell, 762 P.2d 1345, 1354 (Ariz.App.1988), and that appellee in this case need only "allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship.' " Id. at 735 (quoting Flaherty, 492 A.2d at 625).
 
 
 15
 We believe that there was ample evidence in this case to support the holding that Draper and appellee formed an attorney-client relationship; whether Draper actually signed the retention agreement is not dispositive to this finding. Indeed, in Utah the entire question of whether an attorney-client relationship exists is subjective. Thus,
 
 
 16
 [t]he contract may be express or implied from the conduct of the parties.... The relationship is proved by showing that the party seeks and receives the advice of the lawyer in matters pertinent to the lawyer's profession .... Such a showing is subjective in that a factor in evaluating the relationship is whether the client thought an attorney-client relationship existed.... In sum, "[i]t is the intent and conduct of parties which is critical to the formation of the attorney-client relationship"....
 
 
 17
 ... [It is a] factual issue of whether an attorney-client relationship existed....
 
 
 18
 Breuer-Harrison, Inc. v. Combe, 799 P.2d 716, 727-29 (Utah App.1990). Given these rather clear statements by the Utah courts, we cannot say that it was clearly erroneous for the district court to find that such a relationship existed between appellee and Draper, and that the resultant duty of care was subsequently breached by him.
 
 
 19
 Therefore, we affirm the district court's conclusion that appellants' had a duty, which they breached, to advise appellee of potential securities violations.
 
 
 20
 C. Whether Failure To Advise Constituted Proximate Cause
 
 
 21
 Appellants allege that there was not sufficient proof on the issue of whether the appellants' breach of duty was the proximate cause of the losses suffered by appellee. We believe that in this case causation can be inferred, and that it was not clearly erroneous of the lower court to have so found.
 
 
 22
 We find more than plausible the conclusion that, had appellee been informed of the potential for securities violations and the resultant personal liability stemming from EER offerings, she would have taken steps--either before or after the actual sales--to limit or prevent her liability. It would not have been error for the district court to have relied upon this common sense conclusion, as well as any evidence and testimony presented, in making this finding of fact. Because it was not clearly erroneous, we affirm the district court's ruling on causation.
 
 
 23
 D. Whether The Expert Testimony Was Permissible And Credible
 
 
 24
 Appellants contend that the district court, in finding that they breached their duty to appellee, based its finding on impermissible testimony of an incompetent witness. We find ample evidence to support the competency of that witness, Dr. Long. The fact that he has testified in other securities cases, and that he is a professor of securities law of 20 years standing, suggests that the district court did not abuse its broad discretion in qualifying and accepting Dr. Long as an expert. See Firestone Tire & Rubber Co. v. Pearson, 769 F.2d 1471, 1482 (10th Cir.1985); Scholz Homes, Inc. v. Wallace, 590 F.2d 860, 863 (10th Cir.1979); United Telecommunications, Inc. v. American Television & Communications Corp., 536 F.2d 1310, 1317 (10th Cir.1976). Therefore, we affirm the district court on the issue of whether Dr. Long was a competent expert witness.
 
 
 25
 E. The Correct Standard Of Care For An Associate
 
 
 26
 The appellants argue that the court applied the wrong standard of care in finding that Draper, a four-month associate with the law firm, breached his duty to appellee. The court applied the same standard of care to Draper as it applied to the partners of the firm.
 
 
 27
 We find no error in the district court's decision to hold Draper to a specialized standard of care. Draper knowingly acted on behalf of the law firm, an entity that held itself out as capable of performing securities law work. Thus, Draper, as an associate of the firm, undertook to perform duties commensurate with his association with the law firm and his licensed membership in the Utah bar. We cannot take exception with the district court's holding that Draper "failed to meet the standard of care which prevailed among the general community of securities lawyers ... relating to each of the Earth Energy offerings...." Dist. Ct.'s Findings of Fact and Conclusions of Law, at 25. Indeed, "[p]rofessional persons in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability." W. Prosser & P. Keaton, The Law of Torts, (1984) 5th ed.) § 32, at 185 (emphasis added and citation omitted). We therefore affirm this holding by the district court.
 
 
 28
 F. Whether The District Court Erred On The Damage Award
 
 
 29
 The district court carefully considered appellants' argument that the most that could be recovered from appellant was either the $75,000 paid by appellee under the Kelly agreement or $650,000, the total of appellee's personal assets. The district court found that the "$75,000 that [appellee] paid as part of her Settlement Agreement was but a portion of her consideration in the contract; the remainder includes her obligation to diligently prosecute this lawsuit and then turn over any proceeds therefrom." Memorandum Decision and Order Denying Defendants' Motions, at 6. Instead, the court awarded appellee $2,316,090, which reflected her damages in relation to the Nebraska judgment.
 
 
 30
 We agree with the district court that the judgment the investors obtained was stayed in exchange for the appellee's prosecution of the lawsuit, and that appellee still remained liable on the whole judgment--far more than either the $75,000 or $650,000. Thus, rather than forcing appellee into bankruptcy, the Nebraska investors allowed her to garnish all her assets--the largest being the prosecution of this malpractice lawsuit.
 
 
 31
 Ascertaining the correct standard for measuring damages is a question of determining state law. We review de novo the district court's conclusion that the correct measure of damages incurred by appellee is measured by the "judgment rule," which sets the recoverable amount in relation to the liability for the party's adverse judgment, as opposed to the "prepayment rule," which sets damages in relation to the party's current out-of-pocket damages. See Salve Regina College v. Russel, 111 S.Ct. 1217, 1221 (1991) ("court of appeals should review de novo a district court's determination of state law").
 
 
 32
 We find no error in the district court's decision to award damages to appellee by reference to the judgment rule because Utah has apparently adopted that standard. In Ammerman v. Farmers Ins. Exch., 450 P.2d 460, 461-62 (Utah 1969), the court found that in an indemnity case there was no accord and satisfaction, and hence no limitations on damages, when the loser of a lawsuit "who was unable to pay the judgment, [agreed to] cooperate ... and do everything reasonably necessary ... to collect the [j]udgment.... This agreement is executory in nature and does not, as of now, amount to an accord and satisfaction."
 
 
 33
 Therefore, we find no error in the district court's determination of damages suffered by appellee.
 
 
 34
 G. Appellee's Claim For Damages Under Offering 1981-B
 
 
 35
 On cross-appeal, appellee claims error in the district court's factual finding that the retention agreement did not involve offering 1981-B. See Dist. Ct.'s Findings of Fact and Conclusion of Law at 15. Appellee asserts that appellants were responsible for informing her as to potential liability for offering 1981-B. The district court cited ample evidence to support it factual finding that the agreement was not meant to cover the 1981-B offering, Id. at 11, 15, and therefore we will not disturb this conclusion absent a clearly erroneous weighing of the evidence. We affirm the holding that there was no liability for the 1981-B offering because there was never an engagement of legal services for that security.
 
 
 36
 H. Proper Measurement Of Prejudgment Interest Rate
 
 
 37
 The parties disagree as to whether Nebraska's or Utah's prejudgment interest rate applies to appellee's damage recovery. Nebraska's rate is 7.87 percent, while Utah's is 10 percent. The district court ultimately adopted Nebraska's rate of 7.87 percent.
 
 
 38
 Appellants argue that because the damages incurred by appellee are based upon the Nebraska rate of 7.87 percent, it would be unfair to calculate appellants' liability at the Utah rate of 10 percent. They contend that the use of Utah's prejudgment interest rate would result in a 2.13 percent windfall, thus overcompensating appellee. Appellee, in turn, avers that because Utah is the forum state for this federal action and because Utah Code Annot. 15-1-1 (1991 Supp.) states that a chose of action will be awarded prejudgment interest, she should receive the Utah rate of 10 percent.
 
 
 39
 We believe that to the extent appellee has not yet paid the investors because they have stayed execution on their judgment, she should only recover the Nebraska rate of interest. Indeed, the Nebraska judgment is, presumably, accruing interest at the Nebraska rate of 7.87 percent. To this end, appellee's chose of action has, within itself, an imbedded prejudgment interest rate of 7.87 percent. Thus, the Nebraska rate of interest is akin to a moratory rate of interest in that it will compensate appellee for the interest she would owe the Nebraska investors, who are, in a sense, acting as appellee's creditors. Cf. United Telecommunications, 536 F.2d at 1314. Additionally, appellants are correct that appellee "makes no pretense of argument that the extra interest damages are required to make her whole." Answer Br. of Cross-Appellees at 39.
 
 
 40
 We find support for this conclusion in the Utah Supreme Court's statement that "[t]he purpose of a prejudgment interest award is to compensate a plaintiff for actual loss or to prevent a defendant's unjust enrichment." Canyon Country Store v. Bracey, 781 P.2d 414, 422 (Utah 1989). The district court's choice of the Nebraska prejudgment interest rate best accomplishes this objective as it will compensate appellee on the judgment that the Nebraska investors have heretofore stayed.[1]
 
 
 41
 Therefore, we find no error in the district court's adoption of the Nebraska rate of prejudgment interest, and AFFIRM.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 We note that appellee has dedicated some effort to a discussion of what prejudgment interest rate should be applied to the $75,000 appellee paid under her side-contract with the Nebraska investors. For instance, appellee claims that "[t]here is no theory under Utah law that would justify the application of the Nebraska judgment interest rate to this $75,000.... Under Utah law, interest accrues ... [on] this $75,000 at the prejudgment rate of ten percent per annum--not 7.87 percent." Appellee's Br. at 49. See also Appellee's Reply Br. to the Answer Br. of Cross-Appellees at 18
 The question of what the appropriate interest rate on the $75,000 would be, and whether appellee could even recover that amount in addition to her full recovery on her chose of action, is a conundrum whose solution must wait until another day. Simply put, we do not believe that the district court understood the appellee to have requested recovery of that $75,000, nor is there any indication that the district court awarded appellee damages based on the $75,000. For instance, appellee's complaint prays for "indemnification against any and all judgments that may become final against [appellee] ... as the result of a sale of unregistered non-exempt securities...." Appellee's Complaint for Damages for Malpractice at 5 (emphasis added). Likewise, we have examined appellee's first and third amended complaints, and find similar requests for relief in relation to the successful lawsuit filed by the Nebraska Investors. It is clear that the district court awarded appellee damages based on the exact size of her chose of action, i.e., the amount that she had been found liable to the Nebraska Investors. Thus, the district court, after reciting and summing appellee's separate liability for Offerings 1981-C, 1981-E, and 1981-F, then found that appellee was
 entitled to recover a judgment against [appellants] for $2,316,090.00.... The figure of $2,316,090.00 is arrived at as the total of the judgments entered against [appellee] in the United States District Court for the District of Nebraska and which concern the Earth Energy offerings 1981-C, 1981-E, and 1981-F....
 Dist. Ct.'s Findings of Fact and Conclusions of Law at 31 (emphasis added).
 Therefore, we do not believe the appellee's recovery embodied the $75,000 she contracted to pay the Nebraska Investors, and so we do not speculate on what the proper prejudgment interest would be on that amount.