935 F.2d 1090
 33 Fed. R. Evid. Serv. 292, Prod.Liab.Rep.(CCH)P 12,850
Stephen Brent WHEELER, Plaintiff-Appellant and Cross-Appellee,
v.
JOHN DEERE COMPANY, a Delaware Corporation,
Defendant-Appellee and Cross-Appellant.
 Nos. 90-3080, 90-3120.
 United States Court of Appeals,
Tenth Circuit.
 May 16, 1991.
Rehearing Denied in No. 90-3080 June 17, 1991.
 
 Jefferson D. Sellers (Jack B. Sellers, with him on the brief), of Jack B Sellers Law Associates, Inc., Sapulpa, Okl., for plaintiff-appellant/cross-appellee.
 Eric J. Magnuson (and Richard J. Nygard of Rider, Bennett, Egan & Arundel, Minneapolis, Minn. and Paul S. McCausland, Young, Bogle, McCausland, Wells & Clark, Wichita, Kan., with him on the brief), for defendant-appellee/cross-appellant.
 Before MOORE and BALDOCK, Circuit Judges and ANDERSON, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 Plaintiff-appellant and cross-appellee Stephen Brent Wheeler (Wheeler) lost his right arm while servicing a John Deere Titan series model 7720 combine. He brought this diversity case against the combine manufacturer, defendant-appellee and cross-appellant John Deere Company (Deere), on a strict products liability theory, alleging that the combine was unreasonably dangerous and that any warnings were inadequate. In the first trial, a jury found Deere 75% at fault and Wheeler's employer 25% at fault. The jury calculated Wheeler's damages at $3.1 million and the district court entered judgment of $2.3 million against Deere. We reversed the judgment and remanded for a new trial. Wheeler v. John Deere Co., 862 F.2d 1404, 1415 (10th Cir.1988) (Wheeler I ). On retrial, the second jury found Deere 68% at fault, Wheeler's employer 32% at fault, and determined that Wheeler suffered damages of $2,883,407. The district court entered judgment of $1,960,717 against Deere.
 
 
 2
 Wheeler appeals arguing that the district court should have (1) entered judgment in the amount of the first jury verdict, and (2) calculated postjudgment interest beginning from the date of the first judgment. Deere cross-appeals contending that the district court erred in (1) denying its motion to withdraw a stipulation made before the first trial, (2) admitting into evidence Deere's internal design and safety manuals as well as certain expert testimony, (3) formulating the special verdict and jury instructions, and (4) denying Deere's motion for judgment notwithstanding the verdict (j.n.o.v.).
 
 
 3
 Our appellate jurisdiction arises under 28 U.S.C. Sec. 1291. We find no error in the district court's entry of judgment for Wheeler, nor in its calculation of postjudgment interest. Likewise, the district court did not abuse its discretion in (1) holding Deere to the factual admissions contained in Deere's previous stipulation, (2) admitting Deere's design and safety manuals, and (3) allowing the testimony of Wheeler's expert witnesses. The district court's jury instructions provided a comprehensive statement of the governing legal principles and, together with special interrogatories, allowed the jury to consider all material issues. Finally, after reviewing the record, we conclude that Wheeler produced sufficient evidence to raise a jury question as to whether the danger giving rise to Wheeler's injury was open and obvious. We therefore affirm.
 
 Background
 
 4
 The John Deere Titan series model 7720 combine is a self-propelled grain combine powered by a turbo-charged diesel engine. The 7720 combine drives through a field where it cuts and gathers the crop, separates the grain and deposits it into a tank located at the bottom of the combine. Two horizontal augers move the grain from the tank into a sump. A vertical auger then propels the grain through a spout and into a truck driving alongside. The grain augers are engaged by a lever located in the cab. The 7720 combine is equipped with a five-by-five inch cleanout door located at the bottom of the vertical auger. Deere affixed a decal approximately twenty-six inches from the cleanout door warning the operator to "[k]eep all shields in place," and "[d]isengage and shut off all engine and/or motor power before servicing or unclogging [the] machine." Wheeler I, 862 F.2d at 1407.
 
 
 5
 Wheeler spent the summer of 1981 working as a truck driver for Fenton Custom Combining Crew. The crew followed the wheat harvest from Oklahoma to Montana. On September 14, 1981, the Fenton crew had just completed harvesting wheat in Leoti, Kansas and was preparing a 7720 combine to harvest pinto beans. These preparations required the removal of residual wheat and chaff from the grain tank, vertical auger and sump. Larry Fenton, Wheeler's employer, removed the cleanout door from the vertical auger and reached inside the opening. In an attempt to dislodge the remaining wheat residue, Fenton removed his hand and directed Steve Milner, a combine operator, to start the engine and engage the auger from the combine's cab. Fenton and Wheeler stepped back while wheat residue spewed from the auger. The clogging persisted, however, and Fenton directed Wheeler to dig the grain from the auger and sump manually while Fenton attempted to kick the grain down into the sump from the grain tank. Milner disengaged the auger, but left the engine running. Unaware that Wheeler's hand was in the cleanout door, Fenton instructed Milner to engage the auger for a second time. Wheeler's arm immediately was drawn into the auger housing causing severe injuries which resulted in amputation.
 
 
 6
 Based upon strict products liability, Wheeler alleged that his injuries resulted from Deere's defective and unreasonably dangerous design of the 7720 combine. He claimed that the location and size of the cleanout door exposed consumers to an unreasonable danger, and that practicable design alternatives existed which would have eliminated this risk. Wheeler also alleged that Deere failed to provide adequate warnings of the hazards associated with the vertical auger cleanout door. Deere countered that the 7720 combine was not unreasonably dangerous and that Wheeler's injury resulted from his own negligence and that of his coworkers. Deere steadfastly insists that the danger of losing a hand while manually cleaning the combine's vertical auger and sump with the engine running is open and obvious to any reasonable operator; therefore, recovery is barred.
 
 
 7
 Prior to the first trial, Wheeler and Deere entered into a stipulation agreement which provided in pertinent part:In 1979 when the John Deere Model 7720 combine ... was manufactured, it was technologically and economically feasible to design the vertical auger of the combine by incorporating a smaller rear cleanout door, trimming the auger flighting, and adding a second cleanout door on the front of the auger sump.
 
 
 8
 The technological and economic feasibility of using a cleanout door on the front of the auger sump housing would have prevented the accident from happening in this fashion.
 
 
 9
 IV R. doc. 160 at 34-35. Prior to the second trial, Deere sought to withdraw this portion of the stipulation; however, finding the stipulation to be factually accurate, the district court determined that the statements contained therein were "judicial admissions of fact" which could not be revoked. II R. doc. 149 at 18.
 
 
 10
 At trial, Wheeler presented ten witnesses, all of whom had lost portions of their arms in the vertical augers of John Deere Titan series combines. Each of these witnesses had extensive experience with farming equipment. From these witnesses, the jury heard testimony that some grain always remained in the auger and sump of the 7720 combine, even after running the auger after each use.[1] If not removed from the auger, this residual grain could swell and clog the mechanism,[2] or contaminate later harvests.[3] Despite the need to remove residual grain from the auger and sump, Deere provided no instructions to users of the combine on how to accomplish this task.[4] In the absence of such instructions, the common technique was to remove the lower cleanout door, engage the auger and allow the residual grain to escape through the door. Although this procedure violated Deere's admonition that all shields remain in place when the engine was running, several witnesses testified that it was impossible to clean completely the lower auger and sump while complying with this warning.[5]
 
 
 11
 Several witnesses testified that a thorough cleaning was possible only by reaching into the auger and sump and scooping out the residual grain manually.[6] This procedure often involved two or more people because the auger had to be engaged from the cab.[7] It was impossible for the operator in the cab to observe the lower cleanout door to see if the second person was clear.[8] Although the auger was disengaged while the grain was being scooped out manually, the combine engine remained running because restarting a turbo-charged diesel engine in rapid succession may result in costly damage.[9] No warning label was near the lever engaging the auger to remind the cab operator to insure that no one was around the auger.[10] All of Wheeler's witnesses testified as to unexpected danger when, in the process of manual cleanout, the auger suddenly was engaged while the engine was running.[11]
 
 
 12
 Wheeler's evidence was corroborated in significant respects by deposition testimony of two Deere engineers. Thomas Hitzusen, a product design engineer, admitted that certain maintenance functions on Titan series combines, including cleaning the vertical auger, required the engine to be engaged. Indeed, Hitzusen admitted having placed his hand inside the lower cleanout door while cleaning grain out of the auger when the engine was running. See IV R. doc. 160 at 12. Wayne Slavens, the other engineer, also admitted that opening the cleanout door and then engaging the auger "is a reasonable thing to do" when cleaning the vertical auger and sump. Id. at 13. The jury also saw an on-site demonstration of the 7720 combine and was permitted to examine it.
 
 
 13
 Over Deere's objection, the district court admitted portions of Deere's design and safety manuals. Wheeler's expert, John B. Sevart, consulted these manuals and testified that the 7720 combine's vertical auger and cleanout door violated Deere's own safety standards by posing an unnecessary danger and failing clearly to warn of such danger. Id. at 40. Relying upon a Deere manual, Sevart indicated that Deere was aware of the phenomenon that, when two people simultaneously service machinery, accidents often result from miscommunication. Id. at 42. Sevart then expressed an opinion on the design of the cleanout door:
 
 
 14
 Q. And have you an opinion as to whether it was unnecessarily dangerous, more dangerous than it needed to be at that location on this combine as it was designed and made and sold?
 
 
 15
 ....
 
 
 16
 A. [M]y professional opinion [is] that the design was more dangerous than necessary in light of the available alternatives.
 
 
 17
 Q. And have you an opinion whether the machine as made, designed ... was dangerous beyond the expectation of the ordinary user of that machine?
 
 
 18
 ....
 
 
 19
 A. It would be my opinion that the danger associated with the cleanout door would exceed the expectation of the owners and operators of such combines.
 
 
 20
 Id. at 57-58. Deere timely objected to Sevart's testimony on consumer expectations as lacking foundation; however, the district court concluded that such testimony lay within the ambit of Sevart's expertise. See Id. at 5-9. Deere also objected to testimony of Wheeler's treating psychiatrist concerning human factors such as "momentary forgetfulness" which should have been reflected in the design of the 7720 combine.
 
 I.
 
 21
 Wheeler argues that, because Deere did not appeal the amount of damages in Wheeler I, Deere conceded the validity of the amount of damages awarded by the first jury. He therefore seeks to collect $2,325,000 based upon the first jury award instead of $1,960,717 based upon the second. This argument overlooks our reversal in Wheeler I. To "reverse" a judgment means to "overthrow, vacate, set aside, make void, annul, repeal, or revoke it." Black's Law Dictionary 1319 (6th ed. 1990). A judgment reversed by a higher court is "without any validity, force or effect, and ought never to have existed." Butler v. Eaton, 141 U.S. 240, 244, 11 S.Ct. 985, 987, 35 L.Ed. 713 (1891). See Leroy v. City of Houston, 906 F.2d 1068, 1076 (5th Cir.1990); Riha v. Int'l Tel. & Tel. Corp., 533 F.2d 1053, 1054 (8th Cir.1976). Reversal of a judgment and remand for a new trial places the parties in the same position, insofar as relief is concerned, as if the case had never been tried. See Gospel Army v. Los Angeles, 331 U.S. 543, 546, 67 S.Ct. 1428, 1430, 91 L.Ed. 1162 (1947).
 
 
 22
 In Wheeler I, we "reverse[d] the judgment of the district court and remand[ed] for a new trial." 862 F.2d at 1415. Once we reversed the original judgment incorporating the first jury's verdict and our mandate issued, the first verdict became null and void in its entirety. The district court could no more reinstate the damages portion of the first verdict than it could substitute the second jury's award with a larger sum pulled out of a magically appearing hat. See Dr. Seuss, The 500 Hats of Bartholomew Cubbins (1938).
 
 
 23
 With only slightly more seriousness, Wheeler next contends that postjudgment interest should run from the date of the first judgment (February 1986), rather than from the date of the second (October 1989). "Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment...." 28 U.S.C. Sec. 1961(a). The purpose of Sec. 1961 is to compensate successful plaintiffs for the lost time between the ascertainment of damages and the receipt of payment. Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 110 S.Ct. 1570, 1576, 108 L.Ed.2d 842 (1990). Where an award of damages is based on an invalid judgment "[i]t would be counterintuitive.... to believe that Congress intended postjudgment interest to be calculated from such a judgment." Id. (citing FDIC v. Rocket Oil Co., 865 F.2d 1158, 1161-62 (10th Cir.1989) (per curiam)). Accordingly, the extent to which a judgment is invalidated on appeal determines whether the first judgment or the remand judgment triggers the accrual of postjudgment interest. See Ashland Oil v. Phillips Petroleum Co., 607 F.2d 335, 336 (10th Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). Where a case is reversed completely on the merits, postjudgment interest commences on the date of the remand judgment. Kaiser Aluminum, 110 S.Ct. at 1576; Rocket Oil Co., 865 F.2d at 1161-62. In contrast, postjudgment interest accrues on the date of the first judgment when "the reversal is not on any basic liability errors or errors in procedure which affected the basic issues but on a dollar value, a matter of degree." Northern Nat. Gas v. Hegler, 818 F.2d 730, 737-38 (10th Cir.1987), cert. dismissed, 486 U.S. 1063, 109 S.Ct. 7, 100 L.Ed.2d 937 (1988).
 
 
 24
 In Wheeler I, we held that the district court erred by (1) allowing Wheeler to impeach Deere's expert with other accidents which the court had not found in advance to be substantially similar, and (2) admitting exhibits reflecting Deere's subsequent design changes, when Deere had stipulated to their feasibility. 862 F.2d at 1115. Finding neither of these errors harmless, we "reverse[d] the judgment of the district court and remand[ed] for a new trial." Id. Our reversal in Wheeler I was not based upon minor liability errors or procedural oversights by the district court; rather, our disposition resulted from errors "which affected the basic issues" of the trial. See Hegler, 818 F.2d at 737. Therefore, because Wheeler I was a complete reversal on the merits, postjudgment interest properly commenced on the date of the remand judgment.
 
 II.
 
 25
 We next consider various admissibility questions raised by Deere.
 
 A.
 
 26
 Deere argues that the district court abused its discretion by denying its request to withdraw the portion of its stipulation conceding the feasibility of a safer design. Deere claims that the only reason it entered into the stipulation was to comply with our holding in Herndon v. Seven Bar Flying Serv., 716 F.2d 1322, 1326-30 (10th Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984), that subsequent remedial measures are admissible in a products liability action unless the defendant stipulates expressly to their feasibility. Deere contends that Wheeler I overturned Herndon and that the enactment of Kan.Stat.Ann. Sec. 60-3307 (1990 Cum.Supp.) altered Kansas law in product liability actions by prohibiting evidence of subsequent remedial measures. See Kan.Stat.Ann. Sec. 60-3307(a). Deere contends that the legal rationale motivating its entry into the stipulation was vitiated between the first and second trials, and consequently the district court should have set the stipulation aside.
 
 
 27
 A stipulation is an admission which "cannot be disregarded or set aside at will." Lyles v. American Hoist & Derrick Co., 614 F.2d 691, 694 (10th Cir.1980); Vallejos v. C.E. Glass Co., 583 F.2d 507, 510 (10th Cir.1978); Stubblefield v. Johnson-Fagg, Inc., 379 F.2d 270, 272 (10th Cir.1967). Stipulations are not absolute, however, and may be withdrawn whenever necessary to prevent manifest injustice. United States v. Montgomery, 620 F.2d 753, 757 (10th Cir.1980). Cf. Vallejos, 583 F.2d at 510-11 (holding party to stipulation where no manifest injustice would result). District courts consequently are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside. Morrison v. Genuine Parts Co., 828 F.2d 708, 709 (11th Cir.1987), cert. denied, 484 U.S. 1065, 108 S.Ct. 1025, 98 L.Ed.2d 990 (1988).
 
 
 28
 Whether a stipulation entered into for a particular trial should remain binding during a retrial of the same case depends on the nature of the stipulation and the circumstances underlying its formulation:
 
 
 29
 ... where a stipulation is distinctly and formally made for the express purpose of relieving the opposing party from proving some fact or facts, or where a formal admission of facts is made by counsel and becomes a part of the record, such a stipulation or admission, provided it is not by its terms limited to a particular occasion or a temporary object, can be introduced in evidence and is available as proof of the facts admitted upon a subsequent trial of the same action, unless the court permits its withdrawal upon proper application.
 
 
 30
 ....
 
 
 31
 73 Am.Jur.2d Stipulations Sec. 10 at 545-46 (1974). When a stipulation is limited expressly to a single trial and phrased in terms of conclusory, rather than evidentiary, facts, district courts may on retrial free a party from the stipulation. See Hunt v. Marchetti, 824 F.2d 916, 917-18 (11th Cir.1987); Aetna Life Ins. Co. v. Barnes, 361 F.2d 685, 690 (5th Cir.1966). Finally, "[w]here a stipulation is entered into under a mistake of law induced by the then existing state of the case law a [party] is entitled to be relieved of the stipulation if no prejudice results." Logan Lumber Co. v. Commissioner, 365 F.2d 846, 855 (5th Cir.1966).
 
 
 32
 As an initial matter, we question the degree of reliance that Deere placed upon our holding in Herndon when Deere stipulated to feasibility. Although Herndon interpreted Fed.R.Evid. 407, it was a New Mexico diversity case. 716 F.2d at 1324, 1326. Herndon expressly noted an absence of New Mexico law on point. Id. at 1326. Shortly after Herndon, we held that the admissibility of subsequent remedial measures in a products liability case implicates a question of state policy which must inform the application of Rule 407 in diversity. Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 932-33 (10th Cir.), cert. denied, 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984). When Deere entered into its stipulation, the Kansas Supreme Court had adopted the general rule that evidence of subsequent design changes is inadmissible in a products liability case unless the defendant controverts feasibility. See Siruta v. Hesston Corp., 232 Kan. 654, 659 P.2d 799, 808-09 (1983). Although this rule was not codified until amendment of the Kansas Products Liability Act in 1986, it nevertheless comprised Kansas law at the time Deere entered into the stipulation. See Wheeler I, 862 F.2d at 1410 n. 2. Against this legal backdrop, Deere's rationale for the stipulation does not ring true as a reasonable mistake of law for which relief from this factual stipulation might be appropriate.[12]
 
 
 33
 Deere places primary reliance on Hunt v. Marchetti, 824 F.2d 916. In Hunt, the plaintiff brought a libel action against a newspaper for implying that he was involved in the assassination of President Kennedy. During opening argument, the defense stipulated that " '[w]e are not going to prove that [Hunt] was in Dallas' " on the day of the assassination. Id. at 917. The case was reversed on appeal following a verdict for the plaintiff. On retrial, the district court allowed the defendant to withdraw the oral stipulation and permitted the evidence that plaintiff was in Dallas on the day of the assassination. A defense verdict issued on retrial. In the second appeal, plaintiff argued that defendant should not have been allowed to withdraw from the stipulation. The Eleventh Circuit looked to the language of the stipulation and, deferring to the interpretation of the district court, found that defendant's statements in opening argument were not stipulations of fact; rather they merely were stipulations that particular facts would not be contested at trial. Id. at 918.
 
 
 34
 Unlike the defendant in Hunt, Deere made an affirmative, formal, factual statement that it was a feasible to design a safer product and reduced the statement to writing. Such factual statements are judicial admissions, normally binding on a party. Significantly, Deere does not controvert the truth of its admission, see supra note 12; it only complains of being disadvantaged tactically through Wheeler's adroit use of the stipulation agreement before the jury. Under these circumstances, we cannot say that holding Deere to its judicial admissions resulted in manifest injustice. Thus, the district court did not abuse its discretion in declining Deere's request to withdraw from the stipulation.
 
 B.
 
 35
 Deere also challenges evidentiary rulings by the district court allowing Wheeler to (1) introduce Deere's design and product safety manuals into evidence, and (2) present expert testimony on consumer expectations and momentary forgetfulness. The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. Wheeler I, 862 F.2d at 1408.
 
 
 36
 Deere contends that the admission of its design and safety manuals improperly diverted the jury's attention from reasonable consumer expectations to Deere's "fault" despite the fact that negligence is not at issue in strict products liability cases. A manufacturer's compliance with industry standards is irrelevant in a strict products liability case where the determinative question is whether a product is unreasonably dangerous; such standards are germane only in determining a manufacturer's duty of care under a negligence theory. Rexrode v. American Laundry Press Co., 674 F.2d 826, 831 (10th Cir.), cert. denied, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982); Raney v. Honeywell, Inc., 540 F.2d 932, 938 (8th Cir.1976). See also McHargue v. Stokes Div., 912 F.2d 394, 395 n. 3 (10th Cir.1990). If Deere's design and safety manuals were admitted to prove industry standards, such admission would have been inappropriate. See id. However, Wheeler was attempting to prove not only that the 7720 combine was unreasonably dangerous, but also that Deere provided inadequate warnings of the danger giving rise to his injury. In Wheeler I, we upheld the admission of Deere's safety committee meeting records to show the company's awareness of a possible problem and consequent need for a suitable warning. We stated:
 
 
 37
 In Kansas, the imposition of liability upon a manufacturer for inadequately warning a consumer or user regarding the dangers associated with its product is dependent upon the manufacturer's actual or constructive knowledge of the risk: "[T]he adequacy of a warning is ... judged under a reasonableness standard--even if the claim is made under the rubric of a strict products liability defect." Johnson v. American Cyanamid Co., 239 Kan. 279, 718 P.2d 1318, 1324-25 (1986). Consequently, the trial judge properly admitted ... exhibits ... which refer to Deere's awareness of a possible problem.... This evidence is relevant to the issue of whether the combine's warning as it existed at the time of Wheeler's accident was adequate.
 
 
 38
 862 F.2d at 1411 (footnote omitted). See also Kan.Stat.Ann. Sec. 60-3305 (1983) (reasonable user or consumer test for adequacy of warning); O'Gilvie v. International Playtex, Inc., 821 F.2d 1438, 1441-42 (10th Cir.1987), cert. denied, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). This reasoning is equally pertinent with respect to the admission of Deere's design and product safety manuals; they pertain to whether Deere knew of the dangers associated with the vertical auger, sump and cleanout door. Such knowledge is a relevant factor in considering the adequacy of any warning.
 
 
 39
 Deere also argues that the district court erred in allowing Wheeler's expert, John Sevart, to testify that the combine was dangerous beyond the expectation of the ordinary user. According to Deere, because Sevart's skill and expertise lay in mechanical engineering and not consumer sampling, his testimony on consumer expectations lacked foundation.
 
 
 40
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. District courts are accorded broad discretion in determining the competency of expert witnesses. Quinton v. Farmland Indus., 928 F.2d 335, 336 (10th Cir.1991); Kloepfer v. Honda Motor Co., 898 F.2d 1452, 1458 (10th Cir.1990).
 
 
 41
 In a products liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight. See Quinton, 928 F.2d at 337-38 (veterinarian need not be specialist in toxicology to testify on toxic effect of substance on dairy cows); Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 176-77 (5th Cir.1990) (in products liability action against manufacturer of press brake, witnesses may testify on safety of brake design despite lack of personal design experience); Exum v. General Electric, 819 F.2d 1158, 1163-64 (D.C.Cir.1987) (registered engineer experienced in industrial safety and product design, but lacking any specific expertise in kitchen design, qualified to testify in products liability action against manufacturer of industrial fryer); Dixon v. International Harvester Co., 754 F.2d 573, 580 (5th Cir.1985) (design engineer may provide expert testimony on safety of crawler tractor in product liability action against manufacturer despite lack of prior experience approving crawler tractor designs); Martin v. Fleissner GMBH, 741 F.2d 61, 64 (4th Cir.1984) (mechanical engineers were qualified to present expert testimony in product liability action against manufacturer of synthetic fiber crimper although they lacked previous background in either crimpers or the textile industry); Hammond v. International Harvester Co., 691 F.2d 646, 653 (3d Cir.1982) (witness who had sold automotive and agricultural equipment and taught automobile repair at local high school could render expert opinion on safety of loader despite lack of formal education in either engineering or physics). An expert must, however, stay within the reasonable confines of his subject area and cannot render expert opinions on an entirely different field or discipline. See, e.g., Stull v. Fuqua Indus., Inc., 906 F.2d 1271, 1275 (8th Cir.1990) (mechanical engineer may testify to some degree about interaction between human body and mower but may not testify about human anatomy).
 
 
 42
 Sevart was a mechanical engineer with special expertise in the safe design of farm equipment. Inherent in the safe design of mechanical equipment is some anticipation of how such equipment will be perceived and used by consumers. Sevart's testimony that the combine was more dangerous than anticipated by ordinary consumers was within his expertise and, given the technical nature of the case, could have assisted the jury. The district court did not abuse its discretion in admitting his testimony. See Fed.R.Evid. 704(a) (expert witness may testify concerning ultimate issue); Karns v. Emerson Elec. Co. 817 F.2d 1452, 1459 (10th Cir.1987) (in products liability action, court allowed expert testimony that defendant's product was dangerous beyond the expectation of average user; "facts were of a sufficiently technical nature that expert testimony could be expected to assist the jury in deciding the case").
 
 
 43
 Deere next contends that the district court erred in allowing Wheeler's psychiatrist, Dr. Dominic Losacca, to testify that "momentary forgetfulness" is a human factor which Deere should have considered in designing the 7720 combine. Though Dr. Losacca was not a specialist in cognitive psychology, we agree with the district court that his testimony was "fair game" for a psychiatrist testifying on the subject of human judgments. III R. doc. 153 at 770. See LeMaire v. United States, 826 F.2d 949, 951-52 (10th Cir.1987) (district court did not err in permitting cardiologist to render expert opinion on neurological matters given the undisputed relationship between patient's neurological and cardiovascular condition). Dr. Losacca may not have been the optimal witness to speak to cognitive factors that govern product design, but such lack of specialization only affected the weight, not the admissibility of his testimony.
 
 III.
 
 44
 Deere next challenges the jury instructions.
 
 A.
 
 45
 Deere argues that the district court erred in refusing to submit a special interrogatory to the jury on whether the danger posed by the vertical auger and cleanout door was open and obvious. See Fed.R.Civ.P. 49. Because of this oversight, Deere contends that there is no way to determine how the jury resolved the dispositive issue of open and obvious danger.
 
 
 46
 "The submission of special interrogatories lies within the discretion of the trial court and will not be reversed absent an abuse of discretion." Firestone Tire & Rubber Co. v. Pearson, 769 F.2d 1471, 1483 (10th Cir.1985). Once a trial court elects to use such interrogatories on a given element of a plaintiff's claim, all material issues must be included in the interrogatories. Menne v. Celotex Corp., 861 F.2d 1453, 1473 (10th Cir.1988). On the other hand, when jury instructions comprehensively cover all material issues in the case, a district court does not abuse its discretion in denying a request for special interrogatories. Millers' Nat'l Ins. Co. v. Wichita Flour Mills Co., 257 F.2d 93, 101 (10th Cir.1958). See, e.g. Pearson, 769 F.2d at 1483 (no abuse of discretion in denying requested special interrogatories where "the instructions given adequately guided the jury's deliberations"); Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 294-95 (5th Cir.1975) (district court did not abuse its discretion in products liability action by declining to submit special interrogatories concerning theory of recovery); Perzinski v. Chevron Chem. Co., 503 F.2d 654, 660 (7th Cir.1974) (district court did not err in refusing to submit special interrogatory on plaintiff's alleged contributory negligence where issue adequately was covered in other instructions); Rude v. Northwestern Nat'l Cas. Co., 245 F.2d 778, 779-81 (7th Cir.1957) (in view of court's instruction that speed was factor to be considered in deciding whether defendant was negligent in automobile accident case, district court did not err in declining to submit special interrogatory on question of speed).
 
 
 47
 Deere places principal reliance on this court's holding in Martinez v. Union Pac. R.R. Co., 714 F.2d 1028, 1032 (10th Cir.1983), in arguing that it was entitled to a special interrogatory on the open and obvious question. Martinez was a personal injury action arising out of a collision between an automobile and a freight train. The plaintiff contended that the accident resulted from the negligent operation of the train. The railroad contended that the contributory negligence of the driver led to the accident. At trial, a factual dispute arose as to whether plaintiff or a third-party defendant was driving the car at the time of the accident. Although negligence of a driver could not be imputed to a passenger under Wyoming law, the district court declined to submit a special interrogatory on the question of who was driving the car at the time of the collision. We held that the identify of the driver was a material factual issue, the explicit resolution of which was required for the jury to make proper findings on both contributory and primary negligence. Id. at 1033. We further held that the district court abused its discretion in failing to submit a special interrogatory to the jury. Id.
 
 
 48
 Here, the district court instructed the jury that, in order to find Deere liable, it had to find that the combine was "in a defective condition and unreasonably dangerous to persons who might be expected to use the product." I R. doc. 128, instr. 10. The court then instructed the jury on what made a product unreasonably dangerous.
 
 
 49
 [A] product is "unreasonably dangerous" if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it or uses it with the ordinary knowledge common to the community as to its characteristics. In other words, a product is not "unreasonably dangerous" when its degree of danger is obvious or generally known and recognized....
 
 
 50
 Id. instr. 12 (emphasis supplied). Clearly, whether Wheeler's injury resulted from an open and obvious danger within the cognition of a reasonable user was a question material to Deere's liability, however, unlike the situation in Martinez, the jury was not precluded from considering the issue. The obviousness, if any, of the danger associated with the vertical auger, sump and cleanout door on the 7720 combine adequately was covered in the jury instructions. Following instructions 10 and 12, the jury could not have concluded that the combine was unreasonably dangerous without rejecting Deere's contention that the danger was open and obvious and within the cognition of a reasonable user. Accordingly, the district court did not abuse its discretion in denying Deere's request for special interrogatories. See Wichita Flour Mills Co., 257 F.2d at 101; Pearson, 769 F.2d at 1483.
 
 B.
 
 51
 Deere next argues that the district court erred by failing to instruct the jury that Deere had no duty to warn of open and obvious dangers and by substituting the term "unsafe" for the term "unreasonably dangerous" in its definition of a defective product. In reviewing the adequacy of jury instructions, we consider the instructions as a whole. Wheeler, 862 F.2d at 1411. We do not inquire whether the instructions were faultless in every particular respect; rather " '[t]he test is ... whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.' " Menne, 861 F.2d at 1470-71 (quoting Borel v. Fibreboard Paper Prod. Corp., 493 F.2d 1076, 1100 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)).
 
 
 52
 Deere contends that the trial court's refusal to instruct the jury that a manufacturer is not required to warn of open and obvious dangers deprived Deere of an opportunity to have its theory of the case presented to the jury. The district court instructed the jury that "a product is not 'unreasonably dangerous' when its degree of danger is obvious or generally known and recognized; nor is it 'unreasonably dangerous' if the manufacturer has given adequate warnings or instructions that sufficiently alert the user to the risk of danger in using the product." I R. doc. 128, instr. 12. Fully implicit in this instruction is that Deere was not required to warn of open and obvious dangers. We therefore hold that Deere was not precluded from presenting its theory of the case to the jury.
 
 
 53
 Deere next challenges the court's instruction defining product defects. The instruction read:A product is in a "defective" condition if, at the time it leaves the manufacturer's hands, it is in a condition which is unreasonably dangerous to the ordinary user. A product is "defective" if, when it leaves the manufacturer's hand, it is unsafe when used for a purpose for which it was intended or when used for some other reasonably foreseeable purpose.
 
 
 54
 A product may be defective in its design, in its preparation, or by virtue of the inadequacies of the defendant's warnings necessary for the product's safe use.
 
 
 55
 Id. instr. 11 (emphasis supplied). Deere argues that the trial court's substitution of the term "unsafe" for the term "unreasonably dangerous" misled the jury by connoting a lesser degree of danger. According to Deere, the court's instruction left the jury free to impose liability if it found that the 7720 combine was "unsafe," despite that fact that large and complex machines such as the 7720 combine are inherently more dangerous than many consumer products.
 
 
 56
 Deere's focus on one word in a single instruction ignores the broader context in which the jury was instructed. When reading the instructions in their entirety, it is clear that the jury was informed that a product had to be unreasonably dangerous in order to be defective. Instruction 10 informed that jury that, to impose liability on Deere, it had to find that the combine was defective and unreasonably dangerous. Instruction 11 cautioned the jury to view the safety of a product in light of its intended purpose. Viewed as a whole, these instructions adequately apprised the jury that a certain level of danger is inherent in complex farm machinery and that, in order to find Deere liable, the jury would have to determine that the 7720 combine exceeded the degree of danger reasonable for farm combines.
 
 IV.
 
 57
 Deere argues that the district court erred in denying its motion for j.n.o.v., given a lack of evidence on whether the combine was more dangerous than would be expected by an ordinary user. According to Deere, Wheeler never presented evidence controverting Deere's evidence that the danger of injury from cleaning the vertical auger and sump with the engine running was open and obvious.
 
 
 58
 A directed verdict pursuant to Fed.R.Civ.P. 50 is proper " 'only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.' " Wheeler I, 862 F.2d at 1414 (quoting J.I. Case Credit Corp. v. Crites, 851 F.2d 309, 311 (10th Cir.1988)). When reviewing a district court's denial of j.n.o.v., we view the evidence, together with the inferences therefrom, in the light most favorable to the jury's verdict. See McAlester v. United Air Line, Inc., 851 F.2d 1249, 1260 (10th Cir.1988).
 
 
 59
 Section 402A of the Restatement (Second) of Torts 347-48 (1965), adopted by the Kansas Supreme Court in Brooks v. Dietz, 218 Kan. 698, 545 P.2d 1104, 1108 (1976), provides in pertinent part:
 
 
 60
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 
 
 61
 (a) the seller is engaged in the business of selling such a product, and
 
 
 62
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 
 
 63
 Comment i to Sec. 402A provides in pertinent part:
 
 
 64
 The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
 
 
 65
 See Lester v. Magic Chef, Inc., 230 Kan. 643, 641 P.2d 353, 361 (1982) (adopting Sec. 402A comment i). Under Kansas law, a manufacturer is not liable for "dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer or the product." See Kan.Stat.Ann. Sec. 60-3305(c) (emphasis supplied). A manufacturer cannot be held liable for injuries which result from patent dangers, inherent in the product, completely within the cognition of a reasonable user, and incapable of being economically alleviated. See, e.g., Linegar v. Armour of America, Inc., 909 F.2d 1150, 1153-1154 (8th Cir.1990) (purported dangerous defect, that bullet-resistant vest would not protect exposed portions of the body, was open and obvious and within full cognition); Elliott v. Brunswick Corp., 903 F.2d 1505, 1506-07 (11th Cir.1990) (danger of rotating boat propeller sufficiently obvious and within cognition to preclude imposition of Sec. 402A liability upon manufacturer of outboard motor), cert. denied, --- U.S. ----, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991).
 
 
 66
 As noted by the Kansas Supreme Court, a product which contains an open and obvious danger still can be unreasonably dangerous. Siruta, 659 P.2d at 806 ("Simply because the hazard on a piece of equipment is open and obvious does not prevent it from being dangerous to the operator or consumer."). Although an open and obvious danger certainly is material to whether a product is unreasonably dangerous, it is not conclusive. See Lockley v. Deere & Co., 933 F.2d 1378, 1384 (8th Cir.1991). Rather,
 
 
 67
 [w]hether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.
 
 
 68
 Melton v. Deere & Co., 887 F.2d 1241, 1249 (5th Cir.1989) (Reavley, J., dissenting) (quoting Corbin v. Coleco Indus., 748 F.2d 411, 417-18 (7th Cir.1984)). Moreover, merely because a product is misused does not render a particular danger open and obvious. Under Kansas law, a manufacturer can be held liable for the foreseeable misuse of its product. Wheeler I, 862 F.2d at 1413 n. 6.
 
 
 69
 In this case, the jury heard testimony from ten witnesses, all whom suffered injuries substantially similar to Wheeler's. Under both Kansas and federal law, evidence of substantially similar accidents in strict products liability actions is relevant to refute testimony that a given product was designed without safety hazards. See C.A. Associates v. Dow Chem. Co., 918 F.2d 1485, 1489 (10th Cir.1990) ("Both federal and state courts routinely permit introduction of substantially similar acts or occurrences in product liability actions to demonstrate the existence of a defect, to prove notice, or to refute testimony given by defense witnesses."); Ponder v. Warren Tool Corp., 834 F.2d 1553, 1560 (10th Cir.1987) (citing numerous cases). The jury also heard testimony that, in order to clean the vertical auger and sump, the cleanout door had to be removed, the engine turned on and the auger engaged. This procedure clearly circumvented Deere's warning that all shields be in place while the engine was running. However, such misuse was foreseeable because no other apparent method existed to perform this vital maintenance function; indeed, the jury was presented with evidence that Deere's engineers used this same method. Several of Wheeler's witnesses were experienced farmworkers who testified upon belief that it was safe to clean the 7720 combine's vertical auger and sump while the engine was running. All expressed surprise about the manner in which they were injured. Finally, the jury viewed an actual 7720 combine and a demonstration concerning its operation. This evidence, together with the testimony of Wheeler's expert (Sevart), indicates that a jury could conclude rationally that the 7720 combine was more dangerous than would be reasonably expected by an ordinary user of the combine.
 
 
 70
 Deere argues that the proximate cause of the accident was the negligence of Wheeler's coworker who actually engaged the auger, Milner, rather than defective design of the 7720 combine. See generally Lockley, 933 F.2d at 1384 n. 7. However, under the Kansas foreseeable misuse doctrine, negligent use of a product which is foreseeable does not preclude a manufacturer from liability. Wheeler I, 862 F.2d at 1413 n. 6. The jury heard evidence that the auger had to be engaged in the cab from where it was impossible to see whether a person cleaning the auger and sump was clear. Testimony also revealed that no warnings were posted next to the lever used to engage the auger, despite Deere's knowledge that many accidents resulted from miscommunication. Under these circumstances, we must conclude that a reasonable jury could find that, given the design of the vertical auger, sump and cleanout door, it was foreseeable that an operator in a cab negligently could engage the auger while his coworker's hand remained in harm's way.
 
 
 71
 Deere next asks us to follow Melton v. Deere & Co. and hold that there was insufficient evidence to submit the case to the jury. The plaintiff in Melton suffered a similar injury while cleaning the vertical auger and sump of a John Deere Titan series 7720 combine. Applying Mississippi products liability law, the district court granted judgment to Deere, finding that no reasonable jury could find the combine unreasonably dangerous. A divided panel of the Fifth Circuit affirmed, holding that the danger of being injured while cleaning the vertical auger and sump with the engine running was open and obvious; therefore, the 7720 combine could not be unreasonably dangerous under Sec. 402A. Melton, 887 F.2d at 1243-44.
 
 
 72
 Consistent with what we believe to be the proper standard for granting j.n.o.v., see Wheeler I, 862 F.2d at 1414; Melton, 887 F.2d at 1249-50 (Reavley, J., dissenting), we have found sufficient evidence in this record to raise a jury question on whether the danger surrounding the vertical auger, sump and cleanout door was patent, open or obvious and within the cognition of a reasonable user. Drawing all reasonable inferences in favor of the jury's verdict, the proof simply is not all one way, nor does it overwhelmingly preponderate in Deere's favor so as to permit but one rational conclusion.
 
 
 73
 Even if the danger giving rise to Wheeler's injury was apparently patent, open or obvious, we could not follow Melton. A plaintiff still may establish that a product with an apparently patent, open or obvious danger is unreasonably dangerous if he can prove that the danger is not within the cognition of a reasonable user. See Kan.Stat.Ann. Sec. 60-3305(c); Siruta, 659 P.2d at 806-07; Lester, 641 P.2d at 361. See also Wheeler I, 862 F.2d at 1414. Applying Kansas law, we therefore must join with the Eighth Circuit in rejecting the analysis of the panel majority in Melton. See Lockley, 933 F.2d at 1382-1385 (applying Arkansas law, open and obvious danger rule does not bar recovery in strict products liability action; Wheeler I cited with approval).
 
 
 74
 AFFIRMED.
 
 
 
 *
 The Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 See, e.g., III R. doc. 152 at 547 (Milner); II R. doc. 51 at 376 (Giesbrecht), 447 (Melton)
 
 
 [2]
 See, e.g., III R. doc. 152 at 548 (Milner); II R. doc. 51 at 447 (Melton)
 
 
 [3]
 See, e.g., III R. doc. 152 at 550 (Milner); II R. doc. 51 at 405 (Lockley), 421 (Ball)
 
 
 [4]
 See, e.g., III R. doc. 152 at 548 (Milner); II R. doc. 51 at 373 (Giesbrecht), 382 (Adams), 390, 400 (Johnson), 405 (Lockley), 447 (Melton)
 
 
 [5]
 See, e.g., III R. doc. 152 at 549, 590 (Milner); II R. doc. 51 at 376 (Giesbrecht), 383-84 (Adams), 405 (Lockley); 421 (Ball)
 
 
 [6]
 See, e.g., III R. doc. 152 at 548 (Milner); II R. doc. 51 at 376 (Giesbrecht), 405 (Lockley), 429 (Ball), 447 (Melton)
 
 
 [7]
 See, e.g., III R. doc. 152 at 557 (Milner)
 
 
 [8]
 See, e.g., III R. doc. 152 at 583 (Milner); II R. doc. 51 at 402 (Layton)
 
 
 [9]
 See, e.g., III R. doc. 152 at 550-51 (Milner); II R. doc. 51 at 405 (Lockley), 421 (Ball). But see III R. doc. 156 at 1092 (expert testimony that turbocharged diesel may be restarted in rapid succession without harm)
 
 
 [10]
 See II R. doc. 51 at 421
 
 
 [11]
 See, e.g., III R. doc. 152 at 710 (Wheeler), 557 (Milner); II R. doc. 51 at 362 & 371 (Giesbrecht), 385 (Adams), 391 (Layton), 405 (Lockley)
 
 
 [12]
 This case is unlike Logan Lumber Co. v. Commissioner, 365 F.2d 846 (5th Cir.1966) in which the taxpayer stipulated that legal and accounting expenses incurred in the unsuccessful defense of a criminal prosecution were not deductible given Tax Court precedent on the issue. Subsequently, the Supreme Court rejected the Tax Court's position and the Fifth Circuit held that the taxpayer should be relieved from the stipulation given the supervening change in the law. Id. at 855
 In Logan Lumber, the taxpayer stipulated concerning the legal effect of defense expenses. Here, Deere stipulated as to facts (not governing law), and admitted that it was possible to design a safer product. Given the truth-seeking function of a trial, we fail to see how manifest injustice results if Deere is held to facts which it admitted as true in the first trial, and which the district court found to be true in the second trial. See II R. doc. 149 at 8.